

FILED
APR 12 2017
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CPCOGROUP@GMAIL.COM AND MANHATTANLUX@GMAIL.COM THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Jeffrey Weeks, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises controlled by Google, Inc. an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation, and have been since April 2005. I have over seven years of experience investigating financial crimes to include wire and mail fraud, and have investigated fraudulent prime-bank and bank guarantee schemes.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 have been committed by Ali Mohammed Mohajer and Henry Feld. There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. See 18 U.S.C. § 3237. Finally, the offenses under investigation are the subject of a grand jury investigation in the District of Columbia.

## RELEVANT PERSONS AND ENTITIES

6. Ali Mohammed Mohajer, also known as Mohammed Ali Mohajer (Mohajer), is a native of Iran who has used both Canadian and U.S. passports. His U.S. passport, most recently issued in October 2016, identified him as Mohammed Ali Mohajer, date of birth June 28, 1955. His Canadian passport, a copy of which he used to identify himself in the below-described events, identified him as Ali Mohammed Mohajer, date of birth January 7, 1950. Mohajer represented himself as the General Manager of Avis Energy, LTD.

7. Avis Energy, LTD was a company registered in the United Kingdom with self-proclaimed expertise in providing the necessary bank proof of financial capability for the purpose of funding profitable, safe and secured fuel trading and other commodities transactions.

8. Richard Sommerfeld is a U.S. citizen currently residing in Florida. Sommerfeld was the treasurer of Atlantic Coast Fuels, LLC.

9. Atlantic Coast Fuels, LLC was a company registered and incorporated in Nevada whose business is located in Vienna, Virginia.

10. Henry Feld is a U.S. citizen residing in Roslyn, New York. Feld is the president of Manhattanlux Energy Group and the owner of Manhattan Luxury Developers Ltd.

11. Coburn & Greenbaum, PLLC is a law firm in Washington, D.C.

12. The Society for Worldwide Interbank Financial Telecommunication (hereinafter SWIFT) is a global member-owned cooperative and the world's leading provider of secure financial messaging services. It is a network enabling financial institutions worldwide to send and receive information about financial transactions in a secure, standardized and reliable environment. SWIFT is headquartered in La Hulpe, Belgium.

13. MT-760 and MT-799 are SWIFT message codes. These messages are utilized by SWIFT member banks in communications related to Standby Letters of Credit and bank guarantees.

## PROBABLE CAUSE

14. In 2013, Richard Sommerfeld identified a business opportunity for Atlantic Coast Fuels to purchase diesel fuel from a refiner in Russia and deliver the oil for sale to a third party. In order to finance the transaction Sommerfeld required $33.5 million. Henry Feld learned that

Sommerfeld required funding and represented that he could provide a funding source for the oil purchase.

15. On May 28, 2013, Henry Feld, using email address manhattanlux@gmail.com (hereinafter Target Email 1), informed Richard Sommerfeld that he represented a funds provider willing to provide a Standby Letter of Credit for up to $500 million to Sommerfeld. Feld stated his "provider is not willing to negotiate substantially off the 10% [fee] for the attached instrument." Feld attached to this email two sample SWIFT messages as examples of what his "provider" could generate, an MT760 Standby Letter of Credit and an MT799 Pre-Advice.

16. On June 14, 2013, Sommerfeld emailed a Client Information Sheet to Feld at Target Email 1. In the email Sommerfeld stated he would like Feld's still-unidentified funds provider to issue a SWIFT MT799 message to Sommerfeld's counterparty bank in the amount of $33.5 million to facilitate his purchase of the diesel fuel.

17. On June 15, 2013, Feld, using Target Email 1, sent Sommerfeld documents pertaining to the proposed transaction. He attached to this email a document entitled "Irrevocable Trust Instructions" which identified the funds provider for the transaction as Ali M. Mohajer, General Manager for Avis Energy Limited. This document specified that Mohajer would enter into a joint-venture agreement with Sommerfeld which would allow Sommerfeld to use Avis Energy Limited's account at Banco Popular Dominicano (BPD) as his proof of funds for his planned petroleum purchase. Feld advised Sommerfeld that Mohajer would direct BPD to send the Russian refinery's bank Shanghai Commercial and Savings Bank (SCSB) a SWIFT message called an MT-799 "Proof of Blocked Funds" letter. This letter would serve as assurance for the oil refinery that sufficient funds were available and earmarked for the petroleum deal. In return,

Sommerfeld would pay Mohajer $133,750, would cover the $10,000 escrow fee, and would after the first successful oil delivery split profits with Mohajer/Avis Energy LTD and Feld.

18. On June 18, 2013, Sommerfeld agreed to the terms presented by Feld and stated he would get the payment ready to transmit to the escrow agent. On the same day Feld, using Target Email 1, sent an email to Sommerfeld stating "I discussed with Mr Mohajer a target of Thursday to get the swift issued by BPD. This is doable if the docs are fully executed and the transfer from Wells Fargo to Wells Fargo is made today."

19. **On June 18, 2013, Sommerfeld wired $143,750 to Coburn & Greenbaum, the law firm that agreed to act as the escrow agent for the transaction (hereinafter the Escrow Agent).**

20. On June 19, 2013, Feld, using Target Email 1, sent an email to Sommerfeld to which he attached an image of Mohajer's Canadian passport which listed his date of birth as January 7, 1950.

21. On June 21, 2013, Sommerfeld had a conference call with Feld and Mohajer in which they told him that, due to an additional bank fee, Sommerfeld needed to wire an additional $83,750 in order for BPD to complete the transmission of the MT-799 SWIFT message.

22. On June 22, 2013, Sommerfeld transmitted a signed, amended Joint Venture Agreement to Feld at Target Email 1, and on June 24, 2013, Sommerfeld wired an additional $83,750 to the Escrow Agent.

23. On June 24, 2013, Mohajer, using email address cpcogroup@gmail.com (hereinafter Target Email 2), sent an email to the Escrow Agent that stated "This is to advise you that today my client: (Atlantic Coast Fuels, LLC) will be making additional deposit of $83,750 into C&G's Escrow Account at Wells Fargo bank due to some amendments made to the JV

Agreement over the weekend. Kindly notify me upon the said fund being credited to your trust account at Wells Fargo bank today."

24. On June 24, 2013, Mohajer, using Target Email 2, sent an email to Feld at Target Email 1, and copied Sommerfeld. This email forwarded an email from the Escrow Agent in which they confirmed receipt of Sommerfeld's $83,750 wire. Sommerfeld then responded to Feld, at Target Email 1, and Mohajer, at Target Email 2, stating "Ali, thanks for the notification. Over to you now on the MT-799."

25. On June 25, 2013, Mohajer, using Target Email 2, transmitted to Sommerfeld and Feld a document he stated showed BPD transmitted an MT-799 Blocked Funds Confirmation in the amount of $33.5 million to SCSB on behalf of Mohajer's BPD account DP79BPDO00000000000755949921. In the email Mohajer stated "Thank God, the attached copies of MT-799 + MT-011 + Copy of Bank to Bank email Conformation sent by BPD directly to Miss Hsu at SCSB in Taipei, came right on time, as you and I were about to resort to your good old Carrier Pigeon!!"

26. On June 25, 2013, Mohajer emailed the same MT-799 message to the Escrow Agent. Mohajer's transmission of this document to the Escrow Agent caused the Escrow Agent to wire $217,500 from a Wells Fargo branch in Washington, D.C. to two accounts identified by Mohajer, one of which was in the name of "JPierce Investments."

27. At the direction of your Affiant, the FBI Legal Attaché for the Dominican Republic interviewed BPD representative Ana T. Garcia. Garcia stated that BPD has no bank account bearing the number DP79BPDO00000000000755949921. She was presented the MT-799 Mohajer provided to Sommerfeld and cited multiple errors and mistakes in the document which demonstrated the document was not prepared or issued by BPD.

28.  By July 1, 2013, Sommerfeld was unable to confirm that SCSB received the MT-799 from BPD. On July 1, 2013, Mohajer, using Target Email 2 and copying Feld at Target Email 1, forwarded to Sommerfeld an email from littores@bpd.com.do which he claimed was "BPD's email confirmation sent to Miss Joanna Hsu" at SCSB.

29.  On July 22, 2013, at 5:18 PM, Mohajer emailed Sommerfeld and stated he received BPD's investigation report regarding the missing MT-799. Mohajer included in the email text that he claimed to be copied from a BPD email that stated "on June 24, 2013, SCSB receives BPD's MT799. On July 1st 2013, SCSB of Taiwan responded via swift to BPD, referring to BPD's swift MT799 message and stated that the email address used for sending the copies of the respective documents was SCSB's general mail box and furthermore on July 17th 2013, SCSB sends another swift message to BPD, and making an enquiry from BPD, asking that if BPD's client: Atlantic Coast Fuels, LLC has ever successfully executed any Fuel Contract through BPD in the past?" In the same email, Mohajer stated BPD can re-issue the MT-799 via Deutsche Bank to Sommerfeld's counterparty bank if Sommerfeld pays a fee of "0.5% of the face value of the swift MT-799, + $10K Escrow Service Fee, in the Trust Account of Coburn & Greenbaum Law Firm in Washington D.C., only then a new Swift MT-799 will be issued in favor of Applicant's new Bank Coordinates."

30.  Sommerfeld agreed to wire the additional money but chose not to use the Escrow Agent and on July 29, 2013, Sommerfeld wired an additional $167,000 directly to Mohajer's account at Citibank.

31.  On August 1, 2013, Mohajer, using Target Email 2, transmitted to Sommerfeld a document he stated was a copy of the MT-799 that was transmitted to Deutsche Bank Hamburg.

The document listed Deutsche Bank Trust Company of the Americas (DBTCA) as the intermediary for the transmission of the MT-799.

32. Your Affiant showed the MT-799 attached to Mohajer's August 1, 2013 email to a representative of DBTCA, who confirmed that DBTCA never received the SWIFT message in question. The DBTCA representative cited multiple errors and mistakes in the document which demonstrate the document contains incorrect uses of terms that would not be present in an actual MT-799 SWIFT message.

33. Based upon the foregoing, there is probable cause to believe that the representations and SWIFT documents presented by Mohajer and Feld to Sommerfeld were fraudulent instrumentalities utilized to give a false sense of legitimacy to the deal, and caused Sommerfeld to direct wire transfers to be made to Mohajer. In total, Sommerfeld wired $395,000 to accounts designated by Mohajer. The Escrow Agent returned to Sommerfeld the $10,000 escrow fee he paid. No other funds were returned to Sommerfeld.

34. As recently as March 7, 2017, Feld has solicited Sommerfeld to invest in high-yield investment opportunities. For example, on January 30, 2016, Feld, using Target Email 1, sent an email to Sommerfeld, stating "I have a very profitable opportunity for a $60,000 investment. Returns will start within 3 weeks of the investment. Call me for further details if you have interest."

35. On February 11, 2016, Feld, using Target Email 1, sent an email to Sommerfeld in which he offered Sommerfeld to invest in MT-760 Standby Letters of Credit and MT-799 Proof of Blocked Funds and required a minimum investment of between $1-100 million. Feld described one of the investment options as "Cash blocked by MT799 or 760 – 10 M minimum – High Returns."

36. On February 11, 2016, Feld, using Target Email 1, again emailed Sommerfeld and stated "I would like to talk further with you today or tomorrow if you have interest in the following. We will arrange a very thorough DD process for you. The payment to you for the 60 K investment will be 5 M ($5,000,000) within 10 bank days. Yes that is somewhat unbelievable, but I believe you will 'buy in' if you have the time to for the DD and to speak with the principal. We would like a loan agreement signed early this coming week and funding by the 17th."

37. On January 17, 2017, Feld, using Target Email 1, sent an email to Sommerfeld, advertising a "Block by MT799 Trade Program – Cash of 100 M or larger into trade. Investor must transact from a rated bank with MT799 blocked funds. High returns."

38. Based upon the foregoing, there is also probable cause to believe that Feld continued, through Target Email 1, to fraudulently induce Sommerfeld to provide money for additional false investments.

39. On August 10, 2016, Mohajer listed Target Email 2 as his current email address in his U.S. Passport Renewal Application.

40. In general, an e-mail that is sent to a Google, Inc. subscriber is stored in the subscriber's "mail box" on Google, Inc. servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google, Inc. servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Google Inc.'s servers for a certain period of time.

### BACKGROUND CONCERNING E-MAIL

41. In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Google, Inc. allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail

accounts listed in Attachment A. Subscribers obtain an account by registering with Google, Inc. During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google, Inc. subscribers) and information concerning subscribers and their use of Google, Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

42. A Google subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Google. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

43. In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

44. In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This

information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

45. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

## CONCLUSION

46. Based on the foregoing, I request that the Court issue the proposed search warrants. Because the warrants will be served on Google, Inc., which will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## **REQUEST FOR SEALING**

47. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jeffrey Weeks
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on April_____, 2017

APR 12 2017

Honorable Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE